1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    SEYED AMIR SINA MIRMOTALEB              Case No.  21-cv-01960-TSH
     POURSOHI, et al.,
8
                  Plaintiffs,
9                                            **ORDER RE: MOTION FOR**
            v.                               **SUMMARY JUDGMENT**
10
                                             Re: Dkt. Nos. 24, 28, 30
     ANTONY BLINKEN,
11
                  Defendant.
12

13                              **I.    INTRODUCTION**

14          Pending before the Court is the Motion for Summary Judgment filed by Defendant Antony

15   Blinken ("Defendant").  ECF No. 24.  Plaintiffs filed an Opposition (ECF No. 26), and Defendant

16   filed a Reply (ECF No. 27).  Having considered the parties' positions, relevant legal authority, and

17   the record in this case, the Court **GRANTS** Defendant's motion for the following reasons.[1]

18                              **II.    BACKGROUND**

19   **A.     Overview of Immigrant Visa Processing**

20          A foreign citizen seeking to live permanently in the United States requires an immigrant

21   visa.  U.S. Dept. of State, Family Immigration, https://travel.state.gov/content/travel/en/us-

22   visas/immigrate/family-immigration.html (last visited November 16, 2021).[2]  There are two types

23   _____

24   [1] The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF
     Nos. 9, 15.
25
     [2] Federal Rule of Evidence 201(b) provides that "[a] court may judicially notice a fact that is not
26   subject to reasonable dispute because it: (1) is generally known within the trial court's territorial
     jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot
27   reasonably be questioned."  Accordingly, the Court takes judicial notice of (a) the existence and
     nature of the COVID-19 pandemic pursuant to Fed. R. Evid. 201(b)(1), and (b) the public policy
28   statements made by ("OMB") and Department of State ("DOS") cited herein regarding the
     pandemic-related restrictions on DOS's operational capacity to schedule immigrant visa

United States District Court
Northern District of California

1    of family-based immigrant visas: (1) immediate relative visas based on a close family relationship

2    with a U.S. citizen; and (2) family preference visas, which include immigrant visas sought for the

3    foreign citizen spouse of a U.S. Lawful Permanent Resident ("LPR").  *Id.*

4           The National Visa Center ("NVC"), which is part of the U.S Department of State ("DOS"),

5    performs clerical processing for immigrant visa applications, which includes ensuring that all fees

6    have been paid and that the required documents have been submitted (i.e., documentarily

7    complete).  Declaration of Rebecca Austin ("Austin Decl.") ¶ 2.  ECF. No. 24-1.  Only when a

8    case is determined to be documentarily complete and a visa number is available will NVC

9    schedule an appointment for the beneficiary of the application to appear for an interview at a U.S.

10   embassy or consulate overseas before a consular officer.  *Id.* ¶ 4.  Because each embassy and

11   consulate is only able to interview a set number of immigrant visa applicants a day, NVC uses the

12   date on which a case was documentarily qualified to determine the order in which cases are

13   scheduled for appointments in the event demand exceeds processing capacity.  *Id.*  When an

14   interview is scheduled, NVC prepares and sends an appointment letter to the beneficiary and sends

15   the case file to the embassy or consulate before the interview.  *Id.*  Each immigrant visa processing

16   post regularly reports to NVC how many total visa interview appointments it can accommodate.

17   *Id.* ¶ 3.  Based on that information, the NVC schedules cases for each post approximately two

18   months in advance.  *Id.*

19   **B.     Visa Processing During the COVID-19 Pandemic**

20          In March 2020, the Office of Management and Budget ("OMB") directed all federal

21   agencies, including DOS, to utilize the full scope of their legal authority to minimize face-to-face

22   interactions in light of the COVID-19 pandemic.  *See* OMB, Federal Agency Operational

23

24   _____

     interviews, the suspension of routine visa services in response to COVID-19, and the attendant
25   increase in the interview backlog, including those posted on their respective publicly accessible
     websites pursuant to Fed. R. Evid. 201(b)(2).  *See, e.g., Kater v. Churchill Downs Inc.*, 886 F.3d
26   784, 788 n.3 (9th Cir. 2018) (taking judicial notice of documents publicly available on the
     Washington government website, reasoning "neither party disputes the authenticity of the website
27   nor the accuracy of the information"); *CRVQ v. United States Citizenship & Immigration Servs.*,
     No. CV 19-8566-CBM (AGRx), 2020 U.S. Dist. LEXIS 252515, at *25 n.19 (C.D. Cal. Sep. 24,
28   2020) (taking judicial notice of the number of pending visa petitions as posted on USCIS's
     website).

Alignment to Slow the Spread of Coronavirus COVID-19 (Mar. 17, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/M-20-16.pdf; Austin Decl. ¶ 5.  In response to that OMB directive, DOS suspended all routine visa services worldwide on March 20, 2020.  *Id.*  The suspension of routine visa services included suspending the scheduling of immigrant and nonimmigrant visa interviews, as well as the cancellation of visa interviews at consular posts worldwide.  *Id.*

        To protect its workforce and the public from the spread of COVID-19, embassies and consulates implemented physical distancing in waiting rooms, the scheduling of fewer interviews at a time, frequent disinfection of high touch areas, and the requirement that posts follow local health and safety regulations, sharply reducing appointment capacity during the pandemic.  U.S. Dept. of State, Visa Services Operating Status Update, https://travel.state.gov/content/travel/en/News/visas-news/visa-services-operating-status-update.html (last updated Apr. 6, 2021).  For example, there were 18,979 interviews scheduled worldwide in April 2021, well below the 37,267 worldwide interviews scheduled in April 2019.  Austin Decl. ¶ 6.  The reduction in capacity resulted in a dramatic increase in the backlog of immigrant visa applicants waiting for interviews.  *Id.* ¶ 5.  For example, in March 2020, the number of documentarily qualified applicants waiting to be interview stood at 65,481.  *Id.*  By June 2021, there were 566,384 documentarily qualified applicants.  *Id.*; *see also* U.S. Dept. of State, NVC Immigrant Visa Backlog Rep., https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/visas-backlog.html (last updated November 2021) (490,089 as of October 2021).  Due to the ongoing nature of the pandemic and its attendant, adverse effects on the ability of posts to schedule appointments, worldwide processing rates for applications did not return to pre-pandemic levels until recent months.  *See* Austin Decl. ¶¶ 6, 8.

        In July 2020, DOS initiated a phased resumption of routine services.  *Id.* ¶ 5.  On November 12, 2020, DOS provided guidance requiring each chief of mission to prioritize visa applications utilizing a four-tiered approach (1) immediate relative adoption visas, age-out cases, and Special Immigrant Visas for Afghan and Iraqi nationals working with the U.S. government (Tier One), followed by (2) immediate relative visa applicants and K-1 fiancé(e)s (Tier Two),

followed by (3) family preference immigrant visa applicants (Tier Three), the (4) all other immigrant visas, including employment preference and diversity visas (Tier Four). *See id.* ¶ 7; U.S. Dept. of State, Immigrant Visa Prioritization, https://travel.state.gov/content/travel/en/News/visas-news/immigrant-visa-prioritization.html (last updated Nov. 13, 2021).

While the November 2020 guidance instructed posts to schedule and adjudicate some family preference immigrant visas each month, posts are "to maximize their limited resources to accommodate as many immediate relative and fiancé(e) cases as possible with a goal of, at a minimum, preventing the backlog from growing in these categories and hopefully reducing it." Austin Decl. ¶ 7.  In addition, posts are "to schedule and adjudicate some cases in Tier Three . . . each month." *Id.*

The U.S. Consulate General in Montreal, Canada ("Montreal") is the DOS post where the in-person visa interview at issue in this action would take place.  Austin Decl. ¶ 9.  To address the spread of COVID-19, Montreal implemented many of the above-referenced safeguards, which has sharply curtailed its operating capacity.  U.S. Embassy & Consulates in Canada, Consular Operations Updates, https://ca.usembassy.gov/embassy-consulates/consular-operations-updates/ ("What steps are being taken to protect customers from the spread of COVID-19?") (last updated Nov. 5, 2021) ("Canada Consular Operations Updates Webpage").

Like its impact on consular processing worldwide, COVID-19 caused an extraordinary increase in Montreal's backlog.  For example, the number of documentarily qualified immigrant visa applicants waiting for interviews in Montreal was 2,521 in July 2020; by July 2021, that figure surged to 7,427.  Austin Decl. ¶ 10.  Presently, Montreal is scheduling new interviews mostly for Tier Two applicants, but it is also scheduling some new cases in Tiers Three and Four. Canada Consular Operations Updates Webpage, https://ca.usembassy.gov/embassy-consulates/consular-operations-updates/ ("How long will it take to schedule my immigrant visa appointment?") (last updated Nov. 5, 2021).  Most Tier Three and Four cases scheduled for interview were documentarily qualified in October 2019.  *Id.*

United States District Court
Northern District of California

4

United States District Court
Northern District of California

**C.      Plaintiffs' Family Preference Immigrant Visa Application**

Plaintiff Poursohi is a LPR residing in California.  Complaint ("Compl.") ¶ 64.  ECF. No. 1.  Plaintiff Mirmotalebi, who resides in Montreal, Canada, is an Iranian national, a lawful permanent resident of Canada, and Poursohi's spouse.  *Id.* ¶ 65.  Mirmotalebi is the beneficiary of an approved I-130 Petition for Alien Relative filed by Poursohi.  *Id.*  On December 7, 2019, Plaintiffs filed an Immigrant Visa and Alien Registration application on Form DS-260 ("Application") for Mirmotalebi based on the underlying approved I-130.  *See id.*, Ex. A at 2. ECF. No. 1-1.

On February 15, 2020, Plaintiffs submitted the last of the required documentation in support of the Application.  *Id.*, Exh. A at 3.  On May 12, 2020, NVC confirmed that the Application was documentarily qualified, meaning that NVC received all the fees, forms, and documents required to schedule an immigrant visa interview with a Montreal consular officer.  *Id.*, Exh. B at 1.  ECF. No. 1-2.  The Application was then assigned an immigrant visa case number MTL2019826006.  *Id.*, Exh. C.  ECF. No. 1-3; Austin Decl. ¶ 9.  As a family-preference spouse of a lawful permanent resident (F21), Mirmotalebi's application is considered to be in Tier 3 of the prioritization schedule.  Austin Decl. ¶ 9.  Mirmotalebi's interview is waiting to be scheduled according to the date on which the Application was documentarily qualified and based on Montreal's previously reported interview capacity.  *Id.*  Her Application is thus ahead of all other F2l cases for Montreal that were documentarily complete after May 12, 2020.  *Id.*

### III.    LEGAL STANDARD

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If the moving party meets its initial burden, the opposing party must then

set forth specific facts showing that there is some genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250.  The nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the task of the Court "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (simplified).  The nonmoving party has the burden "to identify with reasonable particularity the evidence that precludes summary judgment." *Id.* (simplified).  Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010).  To survive summary judgment, the nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011).  If the nonmoving party fails to identify such evidence, or if it offers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. 242, 249-50 (1986) (citations omitted).

## IV.   DISCUSSION

"In a mandamus action, district courts may 'compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.'" *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 (9th Cir. 1997) (quoting 28 U.S.C. § 1361).  The Ninth Circuit has recognized that "[m]andamus is an extraordinary remedy." *Id.*  It also has "recognized that mandamus relief and relief under the APA are in essence the same" and "elected to analyze [a mandamus] claim under the APA where there is an adequate remedy under the APA." *Id.*

United States District Court
Northern District of California

6

1  (internal citation and quotation marks omitted).

2      Executive agencies covered by the APA are required to conclude matters presented "within

3  a reasonable time" (5 U.S.C. § 555(b)) and the APA gives courts the ability to "compel agency

4  action . . . unreasonably delayed."  5 U.S.C. § 706(1).  The State Department is an "agency" for

5  purposes of the APA.  *Allen v. Milas*, 896 F.3d 1094, 1102-1103 (9th Cir. 2018).  Courts generally

6  analyze these two statutory requirements ("within a reasonable time" and "unreasonable delay")

7  under the same standard.  *See, e.g., NRDC, Inc. v. U.S. Envt'l Prot. Agency*, 798 F.3d 809, 813

8  (9th Cir. 2015)

9      In determining whether agency action has been unreasonably delayed, courts in the Ninth

10  Circuit "look to the so-called TRAC factors in assessing whether relief under the APA is

11  appropriate."  *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997).  The "TRAC

12  factors" are:

13          (1) the time agencies take to make decisions must be governed by a
            "rule of reason;" (2) where Congress has provided a timetable or other
14          indication of the speed with which it expects the agency to proceed in
            the enabling statute, that statutory scheme may supply content for this
15          rule of reason; (3) delays that might be reasonable in the sphere of
            economic regulation are less tolerable when human health and
16          welfare are at stake; (4) the court should consider the effect of
            expediting delayed action on agency activities of a higher or
17          competing priority; (5) the court should also take into account the
            nature and extent of the interests prejudiced by the delay; and (6) the
18          court need not "find any impropriety lurking behind agency lassitude
            in order to hold that agency action is unreasonably delayed."
19

20  *Id.* at 507 n.7 (citing *Telecomms. Research & Action Ctr. v. F.C.C. ("TRAC")*, 750 F.2d 70, 80

21  (D.C. Cir. 1984)).

22  **A.      First TRAC Factor: Rule of Reason**

23      "The most important TRAC factor is the first factor, the 'rule of reason.'"  *NRDC v. United*

24  *States EPA*, 956 F.3d 1134, 1139 (9th Cir. 2020) (simplified); *Community Voice v. United States*

25  *EPA*, 878 F.3d 779, 786 (9th Cir. 2017) ("The most important is the first factor, the 'rule of

26  reason,' though it, like the others, is not itself determinative.").  Consideration of the first factor

27  "requires an inquiry into whether there is 'any rhyme or reason' for the Government's delay – in

28  other words, 'whether the agency's response time . . . is governed by an identifiable rationale.'"

*Palakuru v. Renaud*, 521 F. Supp. 3d 46, 50-51 (D.D.C. Feb. 22, 2021) (citation omitted), *appeal dismissed*, No. 21-5048, 2021 WL 1440155 (D.C. Cir. Apr. 15, 2021). "What constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case." *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1071 (N.D. Cal. 2014) (simplified); *see also Qureshi v. Napolitano*, No. C-11-05814-YGR, 2012 WL 2503828, at *4 (N.D. Cal. June 28, 2012) ("A reasonableness determination is a fact-specific inquiry.").

"Congress has given [the State Department and other agencies] wide discretion in the area of immigration processing." *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 318 (D.D.C. 2020) (alteration in original, citation and quotation marks omitted). "Decisions regarding the admission of foreign nationals are granted an especially wide degree of deference, as they frequently implicate 'relations with foreign powers, or involve classifications defined in the light of changing political and economic circumstances.'" *Didban v. Pompeo*, 435 F. Supp. 3d 168, 176 (D.D.C. 2020) (citation omitted).

### 1.     The Length Of Delay

Plaintiffs acknowledge that "the length of the delay is an important consideration" in evaluating the reasonableness of DOS's inaction on the Application. Opp. at 11:14-15. Plaintiffs do not deny that the Application was not documentarily complete until May 12, 2020. *See id.* at 6:5-7. Plaintiffs filed their complaint on March 19, 2021, twelve months after DOS suspended visa processing worldwide and only ten months after the Application was deemed documentarily complete. However, at the time of this Order, November 2021, the Application has been pending for approximately eighteen months. "Because the period of the delay is the strongest factor, and slightly more than a year is drastically short of what constitutes an unreasonable delay in the Ninth Circuit, only very substantially longer delay could constitute . . . unreasonable delay . . ." *Yavari v. Pompeo*, No. 2:19-cv-02524-SVW-JC, 2019 WL 6720995, at *8 (C.D. Cal. Oct. 10, 2019).

As Plaintiffs also acknowledge, courts have found lengthier delays not to be unreasonable in the immigration context. Opp. at 5:14-15. Courts have held that a "delay of [two years] does not typically require judicial intervention." *Skalka v. Kelly*, 246 F. Supp. 3d 147, 154 (D.D.C. 2017) (citing case law suggesting that even a five- to ten-year delay in the immigration context

8

may be reasonable); *see also Yavari*, 2019 WL 6720995, at *8 (citing case law that "immigration delays in excess of five, six, seven years are unreasonable, while those between three to five years are often not unreasonable"); *Beyene v. Napolitano*, No. 12-CV-1149-WHA, 2012 WL 2911838, at *9 (N.D. Cal. July 13, 2012) (holding that while the "case presents a close call," a delay of nearly five years in adjudicating plaintiff's application for adjustment of immigration status was not unreasonable); *Jamal v. Johnson*, No 2:15-CV-8088-ODW (AFMx), 2016 WL 4374773, at *6 (C.D. Cal. Aug. 15, 2016) (noting that delays of four years not unreasonable, but holding that delay of over seven years to adjudicate plaintiff's application for adjustment of status, combined with Defendants' unwillingness to indicate if or when Plaintiff's petition will be adjudicated, was unreasonable); *Ou v. Johnson*, No. 15-cv-03936-BLF, 2016 WL 7238850, at *3 (N.D. Cal. Feb. 16, 2016) (noting that "courts in this district have generally found delays of four years or less not to be unreasonable under the APA"); *Zhang v. Cissna*, No. 18-cv-09696-MWF, 2019 WL 3241187, at *5 (C.D. Cal. Apr. 25, 2019) ("[T]he Court cannot conclude, as a matter of law, that [four-year] delay in processing [asylum] application was unreasonable.");; *Islam v. Heinauer*, No. C 10-04222 JSW, 2011 WL 2066661, at *8 (N.D. Cal. May 25, 2011) (point of unreasonableness had "not yet come" after three-year delay for adjustment of status).

With respect to processing immigrant visas, "many courts evaluating similar delays have declined to find a two-year period to be unreasonable as a matter of law." *Ghadami v. United States Dep't of Homeland Sec.*, No. 19-00397 (ABJ), 2020 WL 1308376, at *8 (D.D.C. Mar. 19, 2020) (collecting cases). The D.C. district court recently found that a 29-month delay in completing the processing on an immediate family visa application was not unreasonable, particularly in light of the drastically limited capacity due to the COVID-19 pandemic. *Dastagir v. Blinken*, No. 1:20-cv-02286 (TNM), 2021 WL 2894645, at *3-5 (D.D.C. July 9, 2021).

Hence, the eighteen months of inaction alleged in the case at bar does not by itself indicate an unreasonable delay.

### 2.    Reasons For Delay

The global suspension of routine services at its embassies and consulates, including Montreal, due to the COVID-19 pandemic, Defendant's reason for taking longer than usual to

9

1    schedule Plaintiff Mirmotalebi's interview, is also highly relevant and cuts heavily in favor of a

2    finding that the delay here is not unreasonable.

3            Plaintiffs "do not deny the effects that the spread of COVID-19 has had on embassies and

4    consulates" and they acknowledge that "the results have been devastating and the backlogs

5    enormous."  Opp. at 6:27-7:2.  Yet they argue that the Court should find against Defendant

6    because "the source of delay has remained largely unknown."  *Id*. at 12:21-22.[3]

7            However, Defendant has explained at length that the delay in scheduling Plaintiffs'

8    interview is attributable to the safety measures put in place at Montreal to address the spread of

9    COVID-19.  As recounted in detail above, in March 2020, two months before Plaintiffs'

10   Application was deemed documentarily complete, the COVID-19 pandemic compelled DOS to

11   commence a global suspension of routine services at its embassies and consulates, including

12   Montreal, and DPS did not commence even a phased resumption of visa processing until July

13   2020.  DOS was required to implement measures at its embassies and consulates to protect the

14   safety of its employees and the public.  These steps fell squarely within Defendant's broad powers

15   to "administer, coordinate, and direct the Foreign Service of the United States and the personnel of

16   the Department of State," 22 U.S.C. § 2651a(a)(3)(A); *see Tate v. Pompeo*, 513 F. Supp. 3d 132,

17   148 n.8 (D.D.C. 2021) (agreeing that "the Secretary of State's authority to direct the Department

18   and the U.S. Foreign Service in the midst of a global pandemic is authorized under 22 U.S.C. §

19   2651a, which provides broad discretion to determine the allocation of scarce resources in a time of

20   crisis."), *appeal dismissed sub nom. Tate v. Blinken,* No. 21-5068, 2021 WL 3713559 (D.C. Cir.

21   July 22, 2021).

22           Together with local restrictions, DOS's safeguards sharply curtailed its capacity to hold

23   interviews of applicants in Montreal, as in many posts worldwide.  *See, e.g. Dastagir*, 2021 WL

24   2894645, at \*5 (finding that delay was exacerbated by the "slowdown that resulted from these

25   COVID-19 precautions and local restrictions currently in place at the Moscow Embassy.").  As a

26

27   _____
     [3] In this regard, Plaintiffs complain that they were not provided with a certified administrative
     record ("CAR").  The Court addressed this issue and, given Defendant's representation that a CAR
28   does not exist in this case, determined that there was no CAR to produce.  Order Denying Request
     for Case Management Conference, ECF No. 22 p. 2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  result, Montreal experienced an extraordinary increase in its backlog.  For example, the number of

2  immigrant visa applications documentarily complete and waiting for an interview to be scheduled

3  increased from 2,521 in July 2020 to 7,427 in July 2021, close to a three-fold increase.  Defendant

4  asserts that, as of the date this motion was filed, Montreal was scheduling interviews for family

5  preference visa applicants whose interviews were cancelled in March and April of 2020, before

6  Plaintiffs' Application was even documentarily qualified to have an interview scheduled.

7  Plaintiffs' Application is not delayed indefinitely, as they apparently fear, but will be scheduled

8  for an interview in accordance with the date on which it was deemed documentarily complete.

9  *Contrast Islam*, 32 F. Supp. 3d at 1073 (finding that, in light of almost six-year delay and

10  "defendants' unwillingness to indicate if or when [plaintiff's] petition will be adjudicated, the first

11  TRAC factor tips in plaintiff's favor.").

12       Given the unprecedent disruptions to DOS's visa processing capability caused by COVID-

13  19 – which has adversely impacted the processing times of all immigrant visa applicants – the

14  delay in scheduling Plaintiff Mirmotalebi's interview is not unreasonable.  *See Dastagir*, 2021 WL

15  2894645, at *4 ("Issues like a pandemic and local government restrictions are out of the control of

16  the Government and are justifications for delay that the Court is ill-equipped to second guess.

17  These circumstances offer sufficient 'rhyme [and] reason' to explain the Government's response

18  time.") (citation omitted).

19       This Court, like the courts in *Dastagir* and *Mohammad v. Blinken*, finds that the first

20  TRAC factor favors the government where justification for delay is "the lack of processing

21  capacity to accommodate the large backlog of cases at the National Visa Center and the reduced

22  appointment capacity due to the ongoing COVID-19 restrictions. . ."  *Mohammad v. Blinken*, No.

23  1:20-CV-03696 (TNM), 2021 WL 2866058, at *4 (D.D.C. July 8, 2021) (finding wait for K-1 visa

24  interview not unreasonable where plaintiff "sued nine months after USCIS processed her

25  application in March 2020, just as U.S. embassies around the world shuttered because of COVID-

26  19" and her application was still pending for less than two years); *see also Milligan v. Pompeo*,

27  502 F. Supp. 3d 302, 318 (D.D.C. 2020) ("Plaintiffs collectively target delays that began eight

28  months ago, in March, when U.S. Embassies and Consulates around the world shut down.  This

1   timeline alone provides no basis for judicial intervention.").

2        In the case at bar, both the length of the delay and the reasons for the delay in processing

3   the visa application here are governed by "the rule of reason" which, in the context of the global

4   COVID-19 pandemic, indicates that the delay here is not unreasonable.  Accordingly, the first

5   TRAC factor weighs heavily in Defendant's favor.

6   **B.      Second TRAC Factor: Congressional Timetable**

7        "The second TRAC factor considers whether Congress has provided an indication of the

8   speed with which it expects an agency to act."  *Jain v. Renaud*, No. 21-cv-03115-VKD, 2021 WL

9   2458356, at *5 (N.D. Cal. June 16, 2021).  The presence of a statutory scheme – a

10  congressionally-mandated timetable with which Congress expects the agency to proceed – may

11  "supply content" for the "rule of reason" stated in factor one.  *TRAC*, 750 F.2d at 80.  In the

12  instant case, there is no statutorily mandated timeline for DOS to process Plaintiffs' family

13  preference immigrant visa application.  *See Dastagir*, 2021 WL 2894645, at *3 (finding "no set

14  timeline" for processing immediate family immigrant visa applications).

15       While Plaintiffs argue that the Court should afford weight to timeframes mentioned in

16  certain statutes and agency manuals, they acknowledge that any such guidance is precatory (*see,*

17  *e.g.*, Opp. 13:19) and they concede that DOS has "some flexibility in determining the timing of a

18  decision" but argue that "each adjudication must ultimately be completed within a reasonable

19  amount of time."  Opp. at 14:3-17.  Plaintiffs argue that a Congressional timetable "or other

20  indication does in fact exist" in the form of 8 U.S.C. § 1571(b), which states that "[i]t is the sense

21  of Congress that the processing of an immigration benefit application should be completed not

22  later than 180 days after the initial filing of the application . . ."  However, Plaintiffs acknowledge

23  that this expression of Congress's desire for immigration applications to be processed in 180 days

24  is "merely precatory."  *See* Opp. 13:16-20.  Policy statements made by Congress do not create

25  binding, enforceable rights.  *See Yang v. California Dep't of Soc. Servs.*, 183 F.3d 953, 958 (9th

26  Cir. 1999) ("[S]ection 5566(b) couples the phrase 'sense of the Congress' with the term 'should,'

27  yielding the conclusion that this provision is precatory and did not bestow on Hmong veterans any

28  right to food stamp benefits.").

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Furthermore, § 1571(b) is not relevant to the case at bar because, as a sister district court recently explained, "the plain text of § 1571 indicates that it applies to the processing of immigrant benefit applications by USCIS, not consular officials at the State Department" and "therefore lacks bearing on the present controversy." *El Centro Reg'l Med. Ctr. v. Blinken*, No. 3:21-cv-00361-DMS-BDD, 2021 WL 3141205, *4 (S.D. Cal. July 23, 2021).  Furthermore, even if § 1571 applied to this case, it is "non-binding legislative dicta." *Id.* (citing *Mohsenzadeh v. Kelly*, 276 F. Supp. 3d 1007, 1014 (S.D. Cal. 2017) (describing 8 U.S.C. § 1571(b), stating that "[s]imilar statutory "sense of Congress" language has been interpreted as "non-binding legislative dicta."); *Yang*, 183 F.3d at 961-62 (same for section 5566 of the Balanced Budget Act of 1997).

Plaintiffs are also mistaken in their contention that DOS is "required" to process family-preference immigrant visas within 60 days of the application being documentarily qualified.  *See* Compl. ¶ 15.  However, the Foreign Relations Authorization Act, Fiscal Years 2000 and 2001, Pub. L. No. 106-113, § 237(a), 113 Stat. 1501 ("Section 237(a)"), the Congressional policy statement to which Plaintiffs cite, also contains only a precatory timeframe and thus creates no enforceable rights on behalf of applicants.[4]

In the same vein, Plaintiffs allege that similar language in DOS's Foreign Affair Manuals ("FAM") requires Defendant to schedule an interview within 60 days of the Application being documentarily complete.  *See, e.g.*, Compl. ¶¶ 15, 40.  However, Plaintiffs' reliance on the FAM is equally unavailing.  The FAM contains "directives and guidance" for DOS personnel based on statutes, regulations, and other sources.  9 FAM 101.1-1 (Jan. 13, 2017), https://fam.state.gov/FAM/09FAM/09FAM010101.html.  Volume 9 of the FAM deals with the adjudication of immigrant visas, "providing consular officers with the guidance needed to make

---

[4] Sec. 237, "Processing of Visa Applications," provides: (a) Policy: It shall be the policy of the Department of State to process immigrant visa applications of immediate relatives of United States citizens and nonimmigrant K-1 visa applications of fiancés of United States citizens within 30 days of the receipt of all necessary documents from the applicant and the Immigration and Naturalization Service.  In the case of an immigrant visa application where the sponsor of such applicant is a relative other than an immediate relative, it should be the policy of the Department of State to process such an application within 60 days of the receipt of all necessary documents from the applicant and the Immigration and Naturalization Service.

1    informed decisions." *Id.*

2           As the Ninth Circuit has explained, the FAM "lack[s] the force of law" because it was not

3    issued pursuant to notice-and-comment rulemaking.  *Scales v. Immigration and Naturalization*

4    *Serv.*, 232 F.3d 1159, 1166 (9th Cir. 2000).  The FAM lacks the "independent force and effect of

5    law" because it is "not subjected to notice and comment rulemaking" and it was not "promulgated

6    pursuant to an independent congressional authority." *Western Radio Servs. Co. v. Espy*, 79 F.3d

7    896, 901 (9th Cir. 1996).  Because the 60-day policy goal set forth in the FAM lacks the force of

8    law, it creates no enforceable right and DOS's alleged failure to comply with that pronouncement

9    is not subject to judicial review, as courts "will not review allegations of noncompliance with an

10   agency statement that is not binding on the agency."  *Id.* at 900 ("[W]e will review an agency's

11   alleged noncompliance with an agency pronouncement only if that pronouncement actually has the

12   force and effect of law") (citing *United States v. Fifty–Three (53) Eclectus Parrots*, 685 F.2d

13   1131, 1136 (9th Cir. 1982)).

14          Moreover, the language of FAM section 504.7-2(b) on which Plaintiffs rely demonstrates

15   that the timeframe is not mandatory:  "Section 237 of Public Law 106-113 and subsequent

16   legislation require that the Department establish a *policy* under which immediate relative (and

17   fiancé(e)) visas be processed within 30 days of receipt of the necessary information . . . ; all other

18   family-based immigrant visas (IV) must be processed within 60 days.  The Department *expects* all

19   posts to *strive* to meet the 30/60-day requirements." 9 FAM 504.7-2(b) (July 21, 2020),

20   https://fam.state.gov/FAM/09FAM/09FAM050407.html (emphasis added).

21           The use of the words "policy," "expect," and "strive" in 9 FAM 504.7-2(b) is further

22   indication that the pronouncement is precatory and endows no rights on Plaintiffs.  *See Milligan*,

23   502 F. Supp. 3d at 318 (finding FAM did not specify timeline for adjudicating K-1 applications

24   because "the 30-day timeline implemented in the State Department's Manual is merely what it

25   asks itself to 'strive to meet'") (quoting 9 FAM 502.7-3(C)(2)(a)(1)): "The Department expects all

26   posts to strive to meet the 30-day requirement.").

27          While some district courts in the Ninth Circuit have found that the second TRAC factor

28   may still point in a plaintiff's favor even without a statutory timetable, other courts within the

United States District Court
Northern District of California

14

Ninth Circuit have found that the second factor weighs in favor of – or is at least neutral for – the government where, as here, no applicable timetable exists and the alleged delay otherwise comported with the rule of reason.  *See, e.g., Jain*, 2021 WL 2458356, at *5 (finding second factor to be neutral in the absence of a congressionally-mandated timeline); *Varol v. Radel*, 420 F. Supp. 3d 1089, 1097 (S.D. Cal. 2019) ("[T]he timing requirements are not mandatory.  Thus, the timetable, while clear, does not outweigh the rule of reason which supports the USCIS policies which have caused the challenged delays."); *Singh v. Napolitano*, 909 F. Supp. 2d 1164, 1176 (E.D. Cal. 2012) (finding second factor weighed in government's favor because, in the absence of an applicable timetable set by Congress, the government was only required to process the application "within a reasonable time").

Accordingly, given the absence of a mandatory timetable for adjudication of Plaintiffs' Application combined with the fact that the delay comports with the rule of reason, the second TRAC factor also weighs in Defendant's favor or is at least neutral.

**C.     Third and Fifth TRAC Factors: Nature of Interests**

The third and fifth factors overlap, requiring the court to consider whether human health and welfare are at stake, and the nature and extent of the interests prejudiced by the delay.  *Islam*, 32 F. Supp. 3d at 1073.  Plaintiffs contend that the third and fifth TRAC factors tip in their favor because they "have alleged significant harm from family separation."  Opp. at 15:8.  Plaintiffs describe their experience of emotional strain from being separated, the expense and burden of traveling to see each other and maintaining two residences, and the delay in having children.  *See generally* Compl. ¶¶ 77-84.  They also argue that "[d]uring a global pandemic in which Plaintiff Poursohi has been largely unable to visit his wife because of the quarantine requirements set by Canada and his inflexible work schedule, his circumstances are exasperated by the fact that he is in danger of not meeting his physical presence requirement every time that he makes the difficult choice to visit her."  Opp. at 11:16.5-20.5.

The Court understands that "the policies Defendant asserts to justify the delay also implicate human health and welfare because they were designed to slow the transmission of COVID-19."  *El Centro Reg'l Med. Ctr.*, 2021 WL 3141205, at *4.  And, of course, DOS's

United States District Court
Northern District of California

1    actions "have been taken to protect the health and welfare of U.S. mission staff and the public.

2    *Tate*, 513 F. Supp. 3d at 150 (citation and quotation marks omitted).  Nonetheless, "the nature of

3    plaintiffs' interests and the prejudice to those interests in processing their visa[], still weigh in

4    their favor." *Id*.  Accordingly, the third and fifth factors weigh in favor of Plaintiffs.

5    **D.    Fourth TRAC Factor: Effect of Expediting Delayed Action**

6        "The fourth factor requires the Court to consider the effect of expediting adjudication of

7    [plaintiff's] application 'on agency action of a higher or competing priority.'" *Islam*, 32 F. Supp.

8    3d at 1073 (citation omitted).  "Even in situations where all of the other TRAC factors favor

9    granting relief, relief may be denied where a judicial order putting an applicant 'at the head of the

10   queue would simply move all others back one space and produce no net gain.'" *Liuqing Zhu v.*

11   *Cissna*, No. CV 18-9698 PA (JPRX), 2019 WL 3064458, at *5 (C.D. Cal. Apr. 22, 2019) (quoting

12   *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003)); *see*

13   *Jain*, 2021 WL 2458356, at *6 (collecting cases and finding that "[m]ost courts have found that

14   the fourth TRAC factor weighs heavily in the agency's favor when a judicial order putting

15   plaintiffs at the head of the line would simply move all others back one space and produce no net

16   gain").  In fact, "[r]elief that would simply 'reorder' a queue of applicants seeking adjudication is

17   generally viewed as inappropriate when 'no net gain' in such adjudications is achieved." *Tate*,

18   513 F. Supp. 3d at 149.

19       Plaintiffs admit that the Application "falls squarely within the third tier that is being

20   scheduled and processed" by Montreal.  Opp. 7:24-27.  DOS has decided that Tier Three

21   applications are lower priority than Tier One and Tier Two applications.  Here, moving Plaintiffs'

22   Application to the front of the queue would result in no net gain while disadvantaging applicants

23   that DOS has deemed to be of higher priority.  Specifically, Montreal processes very few Tier One

24   cases, so most new cases being scheduled are from Tier Two, i.e., spouses, children, parents and

25   fiancé(e)s of U.S. citizens.  *See* https://ca.usembassy.gov/embassy-consulates/consular-operations-

26   updates/ (last updated Nov. 16, 2021).  Defendant has explained that Tier Two is higher priority

27   than Tier Three because the Immigration and Nationality Act expresses a clear preference for

28   immediate relatives of U.S. citizens over family preference cases.  *See* Mot. at 10 n.2.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs argue that "Defendant has not demonstrated that such a queue exists, or where

2    Plaintiff Mirmotalebi's place in that line is, if not the front."  Opp. 17:4-7.  However, Plaintiffs do

3    not dispute the accuracy or authenticity of the facts that, as of July 2021, Montreal had a backlog

4    of 7,427 documentarily qualified visa applicants waiting for interviews, and Plaintiffs elsewhere

5    acknowledge that most of Montreal's appointment capacity is currently being devoted to Tier Two

6    cases.  *See id*. at 7:17-22.  These facts establish the existence of a queue at Montreal in order of the

7    priorities set by DOS based on statutory immigration policy.

8    In addition to up-ending DOS and congressional priorities, Plaintiffs also ask the Court to

9    place them ahead of other Tier Three applicants whose applications were documentarily complete

10   before Plaintiffs' Application.  Montreal is scheduling Tier Three cases for interview that were

11   documentarily qualified in October 2019, whereas Plaintiffs' Application was not deemed

12   documentarily qualified until May of 2020.

13   The difficulties faced by Plaintiffs are common to many other immigrant visa applicants

14   and do not "justify moving them to the head of the queue" of similarly-situated Tier Three

15   applicants or explain "why their petitions should be processed immediately while other similarly-

16   situated petitioners wait their turn."  *Jain*, 2021 WL 2458356, at *6 ("If, in fact, [defendant's]

17   delay in processing is unreasonable, . . . the impact is not unique to these plaintiffs.");

18   *Naghibolashrafi v. Pompeo*, No. 19-CV-06602-NC, 2020 WL 1288409, at *5 (N.D. Cal. Mar. 18,

19   2020) (finding fourth TRAC factor "weighs strongly in Defendants' favor" where "approximately

20   14,000 other visa applicants are in the same position as [plaintiff]" and "[a]n order by the Court

21   requiring Defendants to immediately adjudicate [plaintiff's] waiver eligibility would delay other,

22   competing waiver applications").

23   Finally, Plaintiffs "do not contest that [DOS] faces an incredible backlog of visas across

24   posts in countries with varied COVID rates and restrictions" and, "[a]s other courts have noted,

25   delays stemming from resource-allocation decisions simply do not lend themselves to 'judicial

26   reordering[s] [of] agency priorities.'"  *Milligan*, 502 F. Supp. 3d at 319 (alterations in original,

27   citations and quotation marks omitted); *Tate*, 513 F. Supp. 3d at 150 ("Given this backlog and the

28   continued suspension of routine operations around the world due to the pandemic, defendants

1   correctly posit that deference to the State Department's priority-setting . . . is necessary.").

2   Plaintiffs' acknowledgment that they "are not requesting that this Court second guess or find fault

3   in determinations that [Defendant] made about the health and welfare of its workforce during the

4   global pandemic" (Opp. at 18:6-8) reinforces the fact that the current situation does not lend itself

5   to judicial reordering of DOS's priorities in adjudicating visa applications.

6          Accordingly, the fourth TRAC factor weighs in Defendant's favor because expediting

7   Plaintiffs' Application would result in no net gain in the appointment backlog while

8   disadvantaging visa applicants of higher priority or of the same priority but whose applications

9   have been pending longer.

10  **E.     Sixth TRAC Factor: Impropriety**

11         With respect to the sixth TRAC factor, there are no allegations of impropriety.  Under

12  similar circumstances, courts in the Ninth Circuit have found this factor to either weigh in the

13  government's favor or to be neutral.  *See Zafarmand v. Pompeo*, No. 20-CV-00803-MMC, 2020

14  WL 4702322, at *10 (N.D. Cal. Aug. 13, 2020); *Najafi v. Pompeo*, No. 19-CV-05782-KAW, 2019

15  WL 6612222, at *7 (N.D. Cal. Dec. 5, 2019); *Islam*, 32 F. Supp. 3d at 1074.

16                                  *       *       *

17         In sum, the first and fourth TRAC factors, which courts routinely afford the most weight,

18  tilt heavily against granting Plaintiffs' request for relief under the APA and the Mandamus Act.

19  The second and sixth factors are either neutral or are slightly in Defendant's favor.  And while the

20  third and fifth factors weigh in favor of Plaintiffs, they do not overcome the first and fourth

21  factors.

22                              **V.     CONCLUSION**

23         Based on the analysis above, the Court **GRANTS** Defendant's motion for summary

24  judgment.[5]

25  _____

26  [5] Five weeks after Defendant filed his reply brief in support of his summary judgment motion, the
    parties filed a joint discovery letter brief in which Plaintiffs moved to compel responses to a set of

27  interrogatories.  ECF No. 28.  Four weeks after that Plaintiffs moved to stay consideration of the
    summary judgment motion pending a ruling on the motion to compel.  ECF No. 30.  The Court

28  denies the motion to compel.  Plaintiffs have not provided an affidavit or declaration under Fed. R.
    Civ. Proc. 56(d) showing that they cannot present facts essential to justify opposing the summary

United States District Court
Northern District of California

1           **IT IS SO ORDERED.**

2

3    Dated: November 16, 2021

4

5                                                THOMAS S. HIXSON
                                                United States Magistrate Judge

*United States District Court*
*Northern District of California*

---

judgment motion.  Therefore, the requested discovery is not proportional to the needs to the needs of the case under Fed. R. Civ. Proc. 26(b)(1).  For similar reasons, the motion to stay the motion for summary judgment is also denied.